Good morning, Your Honors, and may it please the Court. My name is David Pettit, and I'm here for appellants. I'd like to reserve five minutes for rebuttal, if I may. I'd like to start by setting the scene. You've seen how that's worked in other cases, so it works. Yes. If you can say it, we'll see where we go. I got that, Your Honor. I want to set the scene just a little bit because the Railroad's briefs, I think, may be somewhat, may be read to be somewhat misleading. What I'm talking about here, what this case is about, my clients can go outside in the morning and run their finger over the windowsill, and it's going to have dust on it. And they can go out, that's not a gas, it's a solid. These are little particles. And they can go out the next morning and do it again. And this material, we have alleged in the complaint, it's a solid, and it increases my client's risk of cancer. That's what this case is about. It is not a case about gases. The particles we talk about, they come out of the stack propelled by a gas. That's correct, but we're not complaining about the gases or the health effects of the gases. What we're complaining about is the particles. They go onto our client's property, they're breathed, and there's a health risk, there's an excess cancer risk that is caused by that. This is not a case about imposing RIC reliability on truck drivers or locomotive drivers. That's not what this case is about. I was driving here this morning, and I noticed a truck that was, you know, billowing smoke out the back. That's not a RIC re-violation. Maybe I should have called the CHP, but it's not a RIC re-violation, and we're not claiming that it is. What makes this case... Why isn't it? Because there's not imminent substantial endangerment by one truck driving down the road. Excuse me? Because there's not imminent and substantial endangerment to human health or the environment because of one truck driving down the road. What we have here, our fact pattern, is we have... One locomotive would do it? I don't think so, one locomotive. Oh, okay. No, because what we have here is rail yards where you have a concentration of these sources that are emitting diesel particulate matter, and I would admit that somewhere on the margin there could be a fact question. Do we have enough trucks? Do we have enough locomotives that there is a substantial, imminent and substantial endangerment to human health? But we deal with fact questions. Since when I go down the freeway, I see hundreds and hundreds of trucks, that would be fair game, you would think. If I'm... If somebody lives anywhere close to the freeway, you would... Is that your point? I take that's your point. Well, it's close, Your Honor. In Your Honor's situation, I'm not sure who the defendant would be. It's not like the... You know, Caltrans has the right to tell people you can drive on the 110 or you cannot drive on the 110. We do a big class action against all the big trucking companies. That's easy. I mean, let's not worry about finding a defendant. I think... No, I mean... Yeah. I am the defendant, but, you know, I think that folks in our system are really good at finding defendants. It's not usually a real problem. So let's not worry about that. I'm testing your theory. Yes. Your theory is that... If you have enough trucks... Your theory would apply to what goes on, trucks going down the California freeways, correct? It could, if you have enough. That is correct. Well, we know we've got enough. I don't know if you drive the California freeways. The 710 is a good example of what Your Honor is talking about. If you go down the Long Beach, it's full of trucks. And the 5 and the 210. Right. Okay. But, anyway, I'm just trying to get my mind around your idea. Yes. But your idea would encompass that, right? Assuming you can serve... Yes, I think that's a fair statement. I think that it would. I got you. What... Are these diesel particulates, I mean, they're solid or gas? I know there's been a lot of time spent in the briefing on that. I guess I'd like to focus a little bit more on how this is disposal under RCRA. It's a very good question, Your Honor. And let me say preliminarily we alleged handling and disposal. So the... I'm not trying to make a joke here. The disposal question isn't dispositive because we also addressed handling. So that was my question, and I'll just interrupt. The only parts of the statute you're really after are the handling and the disposal. Correct. That is correct. So if we treat handling and disposal, we've treated. You're not worrying about treating or transporting. Correct. You're just talking about handling and disposal. That's correct, Your Honor. And disposal is defined, right? It is. And it's defined as placing it into or on any land or water. Yes. So where in the complaint do you allege that the defendant submitted waste into or on any land or water? Paragraph 38 of the First Amendment complaint. Which says you allege it went into the air and then travels onto? Yes. So you're suggesting that I'm to read that statute to say when it says into or on any land or water that it meant into the air and traveling around until it finally lands on the land? Just like in power engineering. Yes, that's correct, Your Honor. Those were the facts. But power engineering is not quite that, is it? They disposed the mist onto the ground, constituting the illegal disposal. There were three different avenues of disposal in power engineering, Your Honor. One of them was through the scrubbers that the facility had, and those are scrubbers that go on stacks. So one of the disposal modes in that case was this was a mist of hexavalent chromium, not good stuff. It went up the stacks, it traveled through the air in what the court called a mist, and then it settled on the ground. Well, as I read it, it said disposing of the mist onto the ground constituted the illegal disposing. Right. And I didn't suggest that it was into the air and then down to the ground. In fact, I looked at the chromium. It went into the soil on the facility's ground. Right. It leaked underground. Right. And then the power engineering suggests from the Tenth Circuit that it's disposing onto the ground is the problem. As I read it. Well. So you ask you disagree with me. I do in part because, as I said, I believe that one of the fact, and let's think about it in a common sense way. How does stuff get onto the ground? What if, and I use this kind of wacky hypothetical in the brief, what if someone from the rail yard decides, well, we're going to capture this particular matter and we're going to put, there's this crazy technology called sock on a stick that basically fits over the locomotive stack. So suppose somebody says, well, I'm going to capture this diesel particular matter in this device and I'm going to take a shovel full of it and throw it over the fence. Well, how does it get on the ground? It gets on the ground because somebody throws it there. If you take a wheelbarrow and dump it, I mean, there may be some portion where that travels through the air. So I don't really see that something traveling through the air to hit the ground or the water is dispositive or takes this case out of RCRA. If that were true, there would be a whole lot of cases, I think, where everyone would think there's RCRA liability. You have something literally that flies into the air or water and there would not be. So let's assume just for right now then that the wording of RCRA is ambiguous with respect to that on this question of whether disposal includes the same circumstances presented here. Doesn't the legislative history then of the statute resolve that ambiguity and whether it should apply to something that you're describing or the way that the diesel particulates are falling over into your client's area or property? I mean, if we look at the legislative history to resolve that ambiguity, doesn't that come out in defendant's favor? How do you get around the fact that Congress clearly seemed to intend to exclude indirect sources from regulation? Well, I actually think the legislative history comes out in my favor, and let me tell you why. Okay. There's two issues. One is sort of the general, and then there's the indirect source. And let me take the general one first. There are some things that are excluded from RCRA by statute. The Clean Air Act isn't one of them. The indirect source rule was enacted by Congress in 1977. The citizen's provision, citizen's suit provision of RCRA in 1984. So at the time the citizen's suit provision was enacted, Congress knew about the indirect source rule. They could have said any facility that's under an indirect source rule is out of RCRA. They didn't say that. By contrast, if you look at their one example that is excluded by statute, if you have a factory that's on a river and you're discharging a pollutant into the river, you have a permit to do that. You're a point source and you have a permit. You receive the permit. That is not a RCRA claim, and the reason is that's what the statute says. So Congress knows how to exclude matters, including matters under the Clean Air Act. They knew that the indirect source rule existed when the private right of action was created under RCRA, and they didn't exclude it. And on the indirect source rule case, the thing that's most significant to me is here there isn't one. There just isn't. And, in fact, I believe the railroads would take the position that a state can't do that because it would conflict with ICTA, the Interstate Commerce Clause Termination Act. I'm not sure I understand because it seems like rail yards are indirect sources and are not subject to regulation under the Clean Air Act. That's true right now. Okay. So I'm not sure I understand how RCRA can extend them. It seems like that, at least based on my understanding of RCRA's legislative history, the air emissions provision of RCRA, which I don't think establishes an independent action, extends to air emissions already subject to regulation under the Clean Air Act. No, Your Honor, I disagree with that. In fact, I have a 180-degree opposite view of what that means. And the reason I say that is if you look at the citizen provision, the citizen supervision of RCRA is extraordinarily broad. There are, just to back up for just a second, there are portions of RCRA that deal with how you, very detailed, how you deal with solid waste and hazardous waste. And what you would expect is a citizen's provision would say, okay, if you allege a violation of any of those, you can bring a lawsuit. But that's not what this one does. This one is not limited to violations of RCRA itself, but it says any situation where you have disposal handling or whatever that creates, you know, solid or hazardous waste that creates an imminent and substantial danger, that's a RCRA claim. And I don't see any words in there that exempt the Clean Air Act. And as I said earlier, if Congress had wanted to do that, they could have done that. Just as they did for point sources. May I go back to your disposal argument? Yes. It seems to me that what you just argued to me turns the disposal language on its head. The disposal in three says, the term disposal means the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water. Right. Such that such solid waste or hazardous waste or any constituent thereof may enter the environment or be admitted into the air. Right. Or discharged. So it first goes to the ground, not to the air. If I read that it goes to the air first, then I've turned that whole statute on its head. It says admitted into or on any land or water. Such that from the land or the water, it may be emitted into the air. So how do I, I mean, I'm having a tough time with your interpretation. Well, I can see that, Your Honor. But let's look at what you just read. I am reading it and I am looking at it. The emitted into the air part that Your Honor just read. Right. What that means to me, let's say that we have a pollutant that didn't get there, didn't get to the site by the air. It oozes across the land, if you will. And then there are air admissions from that that are toxic. That's covered. That is covered by disposal. So you've got, by these words, it's emitted into the air. So you have a hazardous waste that enters the environment or is emitted into the air. And so there you have expressly where RCRA can handle. Well, after you get into the land or water such that, and now we find out such that what it may do thereafter, then you can go to where you may be going. I guess I'm just having your, I understand what you're arguing. I'm having a tough time with it. Thank you. I understand. What's the regulatory gap? You mentioned in your brief that we need to bridge this regulatory gap between RCRA and the Clean Air Act, and what authority is there for us to fill it? I'm curious. Well, I think that's what RCRA does, Your Honor, and that's why I made the point earlier that the citizen supervision goes far beyond violations of RCRA itself. So you don't have to have like someone who improperly manifested a shipment of solid waste. That would be a classic RCRA violation. You don't have to have that. RCRA can apply. There's many cases where RCRA does apply to water pollution, for example, not point sources but other sources of water pollution, hazardous waste in a dump, which may be regulated by the state. It's an extremely broad statute. And when you look at a rail yard, the Clean Air Act doesn't regulate it. It's not a point source. It's not a mobile source. It's a collection of things. And so unless and until the State of California has an indirect source rule for rail yards, which I believe my distinguished opponents would say is illegal, we don't have a remedy other than RCRA to deal with this problem. Thank you. I see I'm out of time, so thank you. May it please the Court. My name is Mark Helm, and I'm appearing on behalf of the appellees. I think it might be wise to start with those particulates that Mr. Pettit was beginning with. One of the things that we know is that the Clean Air Act, in the first year after it was enacted, the EPA promulgated standards making a criteria pollutant out of particulate matter that comes out of the air. So that stuff that Mr. Pettit is talking about that blows out of stacks and that he alleges harms people was one of the first things that was addressed by the EPA under the Clean Air Act. That was in 1971. We also know that in 1976, when Congress enacted RCRA, the purpose was to deal with the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. That comes from the House report that was quoted in this Court's price decision. Well, we know that this very thing, these particulates that come out of smokestacks, were not unregulated before RCRA. It was not a loophole. It was not an unregulated area. It was something that was within the jurisdiction of the EPA, specifically directed by the Clean Air Act enacted by Congress. So that is a compelling piece of legislative history as to why it is that we are sure that Congress did not intend to use RCRA to deal with this problem. But you would agree with me, wouldn't you, that there's no case really interpreting how small particulates can be before they're deemed gases? Well, there's no case on that, Your Honor. There's no case on it, or do you think that size of the particulate determines the difference between the solids and the gases? I mean, I didn't find a case about that either. Your Honor, let's leave aside disposal, which we've already talked about, but just talk about the definition of solid waste. Excluded from the definition are uncontained gases. It's limited to contained gaseous materials. So if it's an uncontained gas, that means it is excluded from RCRA. I agree. So the question then is, if you have, is the exclusion for uncontained gases limited to laboratory pure filtered gases that have no trace of any solid material whatsoever? Is that what Congress intended to limit the exclusion to? Or does the exclusion for uncontained gases also include uncontained gases that contain with, as part of them, that's the allegation, invisible particles? Literally solid, but invisible, microscopic. And we think that it's clear that Congress did not believe that the inclusion of those particles took it out, to put it in the solid waste definition and outside of the exclusion for two reasons. And that is, why did Congress exclude uncontained gases? The first reason was the Clean Air Act regulates them. That's why uncontained gases were excluded, is that's now within the realm of the Clean Air Act. And significantly, the Clean Air Act regulates gaseous emissions, even if they don't contain particulates, but also if they do. It's regulated them since 1971. I'm sorry. Are you saying that these diesel particulates are not solids or they are solids? We are accepting the allegation that these microscopic particles are literally solid. We are also accepting the allegation that these are part of a gaseous emission stream. Okay? That's in paragraph two and paragraph 38. It is part of the diesel exhaust. And so the question is, are uncontained gases suddenly, do they become solid waste if those gases have tiny particles in them? And the first reason to conclude that they don't suddenly become solid waste is they're still regulated by the Clean Air Act. Well, but the EPA considers particles found in smoke and haze to be pollutants, don't they? I believe it can be, yes, Your Honor. 2.5 micrometers in diameter and smaller? Yes, Your Honor. Well, wouldn't that support the view that this is solid waste? No, Your Honor. To me, it would support the opposite because since the EPA regulates gaseous emissions that emit particulates as part of the Clean Air Act, that's why uncontained gases were excluded from the solid waste definition because they're regulated under another regime. Another way to look at it, Your Honor, a second reason we think why uncontained gases were excluded from RCRA's reach is that they don't contribute to the problem that Congress was trying to deal with. The problem, as found in the legislative findings, and this court endorsed in Safe Air, was the, quote, rising tide of scrap, discarded, and waste materials. So what we're talking about are materials, tangible things, things that can be put in a shovel, that can be, you know, put in a bucket, that can be dumped around. Similarly, as Safe Air stated, again, quoting a different part of the congressional findings, quote, Congress was concerned with waste products of all types that were contributing to ever-increasing landfills. Well, these are tiny particles. A 10-micron particulate matter is 25 times smaller than the diameter of a human hair. These are not tangible. EPA measures particulate matter in total suspended solids, doesn't it? At least at one point it did. I believe at one point it did. Whether it still does, I would have to defer to others. But the point, Your Honor, is that in our view, the presence of particulates in uncontained gases, which is what we have here, does not still, that the uncontained gases still exhibit the characteristics that cause uncontained gases to be excluded from the definition in the first place, which is they're not tangible, they aren't materials, they don't get put in landfills, and they're regulated by the Clean Air Act and the EPA. I'm sorry. I just have a question. The facts in United States v. Power Engineering, how do they relate, if at all, to the circumstances we have here? Well, Your Honor, the district court, the Tenth Circuit said the facility's air scrubber disposed a mist of hexavalent chromium onto facility soil. And do you know where exactly that mist was being released? Well, I think it was being released into the air. I believe it was dripping as a result of something that was happening with the scrubbers. It was not, as I read that opinion, it was not air emissions. The district court said, quote, the air scrubbers discharge condensate only a few feet above the ground and potentially only inches from the ground. So these are dripping, a suspended liquid that is dripping in a mist up to a few inches from the ground. The mist seems to be very much like what's being described here, and so I'm just trying to figure out how that would differ from the diesel particulate matter emissions from the rail. Well, first of all, it's a liquid. It's not an uncontained gas. And second of all, it is, as I understood those facts, it was dripping. It was dripping a few feet from the ground down there, and it was a little bit of a mist, but it was going directly onto the ground. The soil was contaminated up to 30 feet away from the facility, so it was dripping near the facility, close to the ground, and in our view, that is different from air pollution. And, Your Honor, I think it's important. We've been dealing with the disposal definition and the uncontained gas definition separately. When you put them together, we think it speaks even louder. The phrase in the citizen suit provision is disposal of any solid or hazardous waste. Well, for disposal, they didn't mention air emissions. They pointedly excluded from the disposal in the first instance air emissions. Then we say disposal of a solid waste. Solid waste excludes uncontained gases. So, I mean, to me, Congress is ringing a bell. It's waving a flag. It is telling us air emissions is a problem that is being dealt with in another statute, and it happens, a statute that was already in place before RCRA was enacted. What about the case that the plaintiffs rely on out of Ohio, the Citizens Against Pollution v. The Ohio Power Company? Your Honor, I think as the district court held, the error of that court's decision was that it did not view uncontained gases as being excluded. It said since the statute used the word including, that it could therefore also include an uncontained gas. And so the district court felt that that was error, and we agree with that. And that was a plume of gas that's occasionally touching the ground. That seems like air pollution to us, not like RCRA. Let me ask you a further question. I mean, I concentrated on the statute and on what one may do for the civil action, and it seems that counsel has agreed with me. He does not undertake to have any damage based on storage or treatment or transportation only as to handling or disposal. What's your best argument as to his handling arguments? Well, Your Honor, this is the first that we've heard that handling was involved, and it's too late to raise it because you know there is a notice of intent to sue requirement in the statute. The notice that was provided, and those are exhibits to the complaint, speak only of the disposal of this material. There is no, there was nothing in the notice of intent to sue related to handling, and there's nothing with respect to handling in the allegations of the complaint. So I was surprised that Mr. Pettit suggested that at this time. Well, I'm glad you confirmed my surprise when I heard handling. I didn't even prepare for handling yet. I don't think handling is in the case. And I think, you know, in addition to the statutory, the history that we've been talking about with respect to particulates already being regulated before RCRA was enacted, the disposal definition, the solid waste definition, there are some, several respects in which it's clear that if you were to construe the statute as the plaintiffs would like, it would do violence to the statutory scheme that Congress enacted. The first has to do with remedy. All right? Congress in the Clean Air Act faced this exact fact problem. What do you do when you have an air pollution problem that someone thinks creates a substantial endangerment to health? Well, under the Clean Air Act, only the EPA can bring a suit of that kind. So that's what we have here, that it's an air pollution problem that's alleged to have substantial endangerment. Congress said you don't have a citizen suit in that circumstance. So to now say the subsequent enactment of RCRA through this sort of eccentric interpretation, now suddenly, silently, Congress intended to restore this private remedy for this specific fact pattern that previously was not done, that's an unreasonable interpretation. And, in fact, you could look at their own case, the Radzenauer case. That's the main case that they cite on harmonization and so forth. That was where there was the National Bank Act had a venue provision that had particular venue for an action against a federal bank, and then I don't remember if it was the 33 or the 34 Act had a venue provision for securities violations. And the court held one of the things that it held was it wasn't an implied repeal, but it also held the specific governance over the general. Here, where you're specifically dealing with where banks can be sued, you don't expect a general statute dealing with securities actions to override that. And the same thing would be true here. We have a specific statute in the Clean Air Act dealing with what are the citizen remedies that are available in this kind of a problem. It would be unusual at best to think that Congress silently tried to overrule that with general language that was dealing with a much different problem. There are other ways that this would do violence to the statutory scheme. One of them is it would overrule the discretion that was given to Congress, that Congress gave, excuse me, to the EPA to deal with this problem. Congress told the EPA, you have to deal with locomotives. Give us the greatest degree of emission reduction achievable through available technology. EPA was directed to do that. EPA did it. Locomotive regulations resulted. They now say, we don't like those regulations, on page 20 of their brief. It's a sad fact that these regulations will not affect adequate change in DPM emissions. In the district court, on page 8, they said, the EPA locomotive regulations do not provide the needed protection. So what we have here is a plaintiff is disagreeing with the judgments that were made by the administrative agency that was charged to deal with this problem, and is trying to circumvent that delegation of responsibility by taking upon itself the duty of trying to correct it through a citizen suit, which Congress never intended. And then the final thing I'll just mention is what the court already alluded to, which is the absurd result that any collection of diesel trucks, diesel buses, diesel engines in facilities, in manufacturing and in vehicles, whenever they're accumulated sufficiently to allegedly be harmful, that that would lead to suddenly regulation of air pollution under RCRA. That would be hiding elephants in mouse holes, in Justice Scalia's language, in a way that Congress didn't intend. Thank you. Do you have any other questions? All right. Thank you very much. Thank you, Your Honor. You went near over before. I'll give you 30 seconds. Thank you, Your Honor. I think you were over, really. I was over, and I appreciate the extra time. Just one point that I want to make, and that's about how the Clean Air Act works. It's correct, of course, that Congress and the EPA regulates PM2.5, that is 2.5 microns, very small stuff. But the party regulated, the person who takes the brunt of that, is the Air District. That is a regional regulation, sometimes statewide. So it's not the case that if you were driving a truck down the road and your emissions of PM2.5 are over a certain level, you are not in trouble with the feds or the EPA because of that. The region may be in trouble, but you are not. That's not how it works. Thank you. Thank you. Thank you, counsel. We very much appreciate your arguments today, appreciate your preparation and your briefs, and getting us into this very delicate area of the law. We appreciate you. Thank you very much, and court is in recess.
judges: Fernandez, Smith, Murguia